363 So.2d 1350 (1978)
SHARPSBURG FARMS, INC.
v.
Melvin WILLIAMS et al.
No. 50404.
Supreme Court of Mississippi.
October 4, 1978.
Rehearing Denied November 29, 1978.
*1351 Case, Montgomery & Smith-Vaniz, S.F. Stater, III, C.R. Montgomery, William Larry Smith-Vaniz, Canton, for appellant.
James H. Herring, Canton, for appellees.
Before ROBERTSON, P.J., and LEE and BOWLING, JJ.
ROBERTSON, Presiding Justice, for the Court:
On April 8, 1977, the Circuit Court of Madison County entered a judgment in favor of plaintiffs, Melvin Williams and Van Stewart, doing business as S & W Farms, a partnership, against defendant, Sharpsburg Farms, Inc., a Mississippi corporation, for $35,200 ($32,000 actual damages and $3,200 attorneys' fees). On April 14, 1977, the trial court entered a remittitur of $3,000, which remittitur was accepted by the plaintiffs, thus reducing the judgment to $32,200. Defendant appeals.
In their Declaration, plaintiffs claimed that on February 23, 1976, they had advanced $400 on the annual rental of $10,000 due November 1, 1976, under the terms of a written lease contract, and that this advance extended for one more year the lease of 532 acres of land, that the defendant "breached the covenants" of the written lease when it sold 428 acres of the leased land in late October, 1976. Defendant answered that the $400 was a personal loan to James and Marjorie Duncan, that the sale was made under the express authority of the written lease, and that due and timely oral and written notice of the sale was given plaintiffs.
The written lease of November 1, 1973, was entered into
"[B]y and between Sharpsburg Farms, Inc., a Mississippi corporation, hereinafter referred to as the Lessor and Melvin Williams and Van Stewart, doing business as S & W Farms a partnership, hereinafter referred to as the Lessee, ..."
It provided in pertinent part:
"1. That the Lessor, subject to the considerations and conditions contained herein, does hereby let and lease unto the Lessee and the Lessee, subject to the considerations and conditions contained herein, does hereby agree to lease . .
2. That the terms of this lease shall be from November 1, 1973, until December 31, 1978, for the annual rental of $10,000 with the payments being due and payable as follows, to-wit:

 November 1, 1973 - $10,000.00
 November 1, 1974 - $10,000.00
 November 1, 1975 - $10,000.00
 November 1, 1976 - $10,000.00
 November 1, 1977 - $10,000.00

3. That the Lessor and Lessee agree that the above described property shall be used for the raising of cotton, soybeans, milo or other crops commonly grown in Madison County ...
.....
6. That the Lessor reserves the right to sell the above described property at the end of each of the annual payment periods above described and that said sale shall serve to terminate the terms and conditions of this lease. (Emphasis added).
7. That should either of the parties be required to retain an attorney and resort to any court for the enforcement of this *1352 lease or seek damages thereunder the party in default shall pay the party damaged a reasonable attorney's fee."
A written amendment entered into some time in 1976 by the lessor and lessee provided that the leased lands could also be used for the raising of cattle.
The court sustained a motion to dismiss James H. Duncan as a party defendant because the allegations of the declaration were against the corporation alone.
On February 23, 1976, Duncan asked Melvin Williams to lend him $400. Duncan and his wife, Majorie, being friends of long standing with Williams and his wife, Charlotte, the loan was closed informally on a fishing trip. At Williams' instance, his wife filled out the blank check form, as follows:

 Canton, Miss., 2 - 23 1976 
Pay
To The
Order of James & Margie Duncan $400.00 
Four Hundred & no/100 DOLLARS
XXX-XXX-X
 CANTON
 EXCHANGE BANK S & W Farm 
 Canton, Mississippi Melvin Williams
Portion of Rent for
 1977

Only "S & W Farm Melvin Williams" was written by Williams. According to Mrs. Williams, the additional words "Portion of Rent for 1977" were added in the lower lefthand corner of the check because of this colloquy:
"A... . he asked when we got to the feed pond, he asked Jimmy if he wanted the loan to apply to rent for next year.
Q. Mr. Duncan asked 
A. No, 
Q.  Melvin asked Mr. Duncan 
A.  if he wanted the loan to apply on the rent for next year and Jimmy said yes, said that would be great and it helped us it would make it, you know, better for him cause he wouldn't have to pay it back and that suited him fine and so that's when I made the check out.
Q. Okay, now Mrs. Williams are you sure that you didn't add that language, portion of rent for 1977 after the check was cashed.
A. No, I didn't.
Q. Did you write that on there before the check was given to Mr. Duncan?
A. Yes I did, before I gave it to him."
Williams testified that it happened in this way:
"A. She asked me what did I want to put on the check and I asked Mr. Duncan about just be part of the rent and then he wouldn't have to pay it back and he said that was fine with him. Just put portion of the rent.
Q. Just put portion of the rent?
A. Part of the rent for '77 and that way he wouldn't have to pay it back."
Duncan testified that rent wasn't mentioned when the loan was closed and that he didn't see the notation "Portion of rent for 1977" on the check when it was handed him. The check was to pay personal debts.
Mrs. Marjorie Duncan testified:
"A. Well nothing was said about the rent. He told his wife to write out a check and give it to Jimmy for four hundred dollars and she in turn made it out and gave it to Melvin and Melvin gave it to Jimmy and Jimmy gave it to me."
The proceeds of the loan were to pay personal debts, according to Mrs. Duncan.
This $400 check was not mentioned again by the Duncans or Williams until Sharpsburg Farms, Inc., on October 4, 1976, entered into a written contract to sell approximately 428 acres of the 532 acres leased, to W.B. Patterson. A day or so later, Duncan told Williams that the lands were being sold. When Mrs. Williams phoned Mrs. Duncan, Mrs. Duncan verified the proposed sale.
On October 12, 1976, C.R. Montgomery, attorney for Sharpsburg Farms, Inc., wrote James H. Herring, attorney for S & W Farms, Van Stewart and Melvin Williams:

*1353 "Pursuant to our conversation last week I would like for you to receive this notice for and on behalf of your client. That Sharpsburg Farms, Inc. has contracted to sell the subject property which your client rents and intends to accomplish this fact on or before November the first, 1976."
On October 28, 1976, a check filled out, as follows, was tendered Sharpsburg Farms, Inc.:
 Canton, Miss., Oct. 28 1976
Pay
To The
Order Of Sharpsburg Farms, Inc. $9600.00
 Nine Thousand Six Hundred & 00/100 DOLLARS
C Canton
 E Exchange Bank
 B Canton, Mississippi S & W Farm 
XXX-XXX-X Melvin Williams
Rent Payment
for 1977 less 400.00 Partial Advance Payment
On October 29, 1976, Montgomery wrote Herring:
"For and on behalf of my clients, Sharpsburg Farms, Inc., I am herewith returning your client's check in the amount of $9,600.00 for rent payment of 1977. Additionally, I am returning a check signed by Mrs. James H. Duncan for a personal loan in the amount of $400.00 which was made to Mr. Duncan some time ago."
On October 29, 1976, a warranty deed was executed by Sharpsburg Farms, Inc. to W.B. Patterson conveying approximately 428.3 acres of the 532 acres leased.
On December 30, 1976, Melvin Williams and Van Stewart, doing business as S & W Farms, a partnership, filed their declaration against Sharpsburg Farms, Inc., a Mississippi corporation, and James H. Duncan, stating among other things:
"[T]hat the aforesaid $400.00 payment was an advance rental payment on the $10,000.00 rental payment that was due to defendants from plaintiffs on November 1, 1976; that defendant Duncan in his capacity as agent and within his authority as President of defendant corporation accepted the aforesaid $400.00 advance payment, thereby altering the terms and conditions of the lease aforesaid.
5. That plaintiffs, in reliance on the assurance of defendant Duncan, acting in his capacity as agent and within the scope of his authority as President of Sharpsburg Farms, Inc., that plaintiffs would be granted use of the aforesaid premises for at least one more year after November 1, 1976, planted rye grass on said premises in order that they might graze their herd of cattle on said premises; ..."
Plaintiffs closed Count I of their Declaration with this statement as to damages suffered:
"8. That as a direct and proximate result of the actions of defendants, plaintiffs have been severely damaged and will be further severely damaged in the future in that they will effectively be deprived of their rye grass crop during that period of the year 1977 when it is most needed and will be forced to sell approximately 300 calves much earlier than anticipated because their rye grass crop will not be available to graze them on during the winter and spring months of 1977, thereby limiting the weight of said calves at the time of sale; that plaintiff will additionally lose the expenses incurred by them in planting the aforesaid rye grass; that as a result of the aforesaid, plaintiffs seek actual damages in the amount of $50,000.00."
Although there are seven assignments of error, in view of our decision on assignment of error number 5, it will be unnecessary to discuss the other assignments of error. Number 5 is:
"5. The Court erred by denying the motion of the Defendant for a peremptory instruction at the close of the Defendants' case as the evidence did not show any modification or alteration of the terms of the lease contract and further, the Plaintiffs did not show a violation of the terms of the lease contract and therefore the Defendants acted properly in their sale of the property and the Plaintiffs did not establish an actionable wrong which was perpetuated [sic] against them."
*1354 In Stuart v. McCoy, 163 Miss. 551, 141 So. 899 (1932), this Court said:
[I]n the construction of a written lease, the intention of the parties must be ascertained from the language of the instrument itself, where that is not ambiguous. Where the language of a deed or lease is unambiguous, "the object is to ascertain the intention of the grantor as expressed by the language used, and not the unexpressed purpose which may at the time have existed in his mind, the question being not what the parties meant to say, but the meaning of what they did say, the actual intention contrary to the legal effect of the deed being immaterial, even though apparent from that instrument itself." 8 R.C.L., p. 1039, section 95.
The description of the land covered by the written lease being clear and unambiguous, it was error to permit it to be varied by oral testimony tending to show that by the exception therein it was intended to except lands in section 32 instead of section 29. 163 Miss. at 555, 141 So. at 899. (Emphasis added).
There is no ambiguity in section 6 of the written lease; it is couched in clear, positive and express language:
"6. That the Lessor reserves the right to sell the above described property at the end of each of the annual payment periods above described and that said sale shall serve to terminate the terms and conditions of this lease."
The contracting parties recognized that the written lease represented their intentions because even when the only change was to allow the use of the land for cattle farming, a written amendment was executed in 1976 to express this rather insignificant change.
In 51C C.J.S. Landlord and Tenant § 232(2) (1968), we find this language:
"The language of a lease, or of a clause thereof, which is clear ordinarily cannot be extended by implication or intendment. It is not the province of the court, by construction, to change the contract or make a new contract for the parties to a lease, or to supply material stipulations or conditions, or to create terms or conditions which contravene the agreements of the parties."
The principal purpose of the Statute of Frauds [Miss. Code Ann. § 15-3-1 (1972)] is to require the contracting parties to reduce to writing the specific terms of their contract, especially an agreement affecting lands for more than one year, and thus to avoid dependence on the imperfect memory of the contracting parties, after the passage of time, as to what they actually agreed to some time in the past. Section 15-3-1, in pertinent part, provides:
"An action shall not be brought whereby to charge a defendant or other party:
.....
"(c) upon any contract for the sale of lands, tenements, or hereditaments, or the making of any lease thereof for a longer term than one year; (Emphasis added).
(d) upon any agreement which is not to be performed within the space of fifteen months from the making thereof;
.....
unless, in each of said cases, the promise or agreement upon which such action may be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith or signed by some person by him or her thereunto lawfully authorized in writing."
This case is a classic example of the great need for such a law. The plaintiffs' case depends on the memories of four people as to what was said and done as they traveled to a fish pond. As could be expected, Mr. and Mrs. Williams remembered the transaction one way, and Mr. and Mrs. Duncan the diametrically opposed way. The plaintiffs' contention, and the heart of their case, is that the specific terms of their written lease contract, can be and were varied by a casual conversation on their way to the fish pond. The gist of their argument is that by the payment of $400.00 *1355 on February 23, 1976, to "James & Margie Duncan" on an annual rental of $10,000 due to Sharpsburg Farms, Inc., that thereby the written lease was extended from November 1, 1976, to November 1, 1977, and the specific written provision that the Lessor, Sharpsburg Farms, Inc., could sell by November 1st, 1976, was somehow stricken from the lease. According to the plaintiffs, this would all come about because in the lower lefthand corner of the $400 check Mrs. Williams had written, at her husband's instance, the words "Portion of rent for 1977." The plaintiffs' argument in the lower court was that the court should infer that this notation had reference to the rental of lands by Sharpsburg Farms, Inc. to S & W Farms by a written lease entered into on November 1, 1973, and that because Duncan was the president and Mrs. Duncan the secretary, and the sole stockholders in Sharpsburg Farms, Inc., that the trial court should also infer that Duncan was acting for and by authority of the corporation when he accepted the $400 check. This was the plaintiffs' argument, in spite of the fact that the uncontradicted testimony was that this was a personal loan to the Duncans to pay off personal debts. It all boils down to the fallacious argument that one of the contracting parties can unilaterally vary the terms of a written contract by parol evidence.
The plaintiffs did not charge fraud or mistake. This case would thus appear to fit under the parol evidence rule that:
"[I]f the writing is complete on its face and unambiguous, parol evidence is not admissible to contradict, vary, alter, add to, or detract from, the instrument ... `in the absence of fraud or mistake.'" Allen et al. v. Allen et al., 175 Miss. 735, 741, 168 So. 658, 659 (1936).
In Fuqua v. Mills, 221 Miss. 436, 73 So.2d 113 (1954), this Court, in again defining the parol evidence rule, quoted with approval from Kendrick v. Robertson, 145 Miss. 585, 111 So. 99 (1927):
"[T]he rule that the terms of a written contract or conveyance cannot be varied or added to by parol evidence is not merely a rule of evidence, but is one of substantive law, and, in measuring the rights of the parties to a written contract or conveyance, which, on its face, is unambiguous and expresses an agreement complete in all of its essential terms, the writing will control. Jones, Commentaries on Evidence, Vol. 3, par. 434; Wigmore on Evidence, Vol. 4, pars. 2400 and 2425." 221 Miss. at 450, 73 So.2d at 119.
There was no evidence of agency or authority from the corporation, Sharpsburg Farms, Inc., to Duncan to negotiate a loan for it. The allegation in the declaration "that defendant Duncan in his capacity as agent and within his authority as President of defendant corporation accepted the aforesaid $400 advance payment, thereby altering the terms and conditions of the lease aforesaid," is thus a conclusion of the pleader and nothing more. Yet this conclusion is refuted by the undisputed testimony of the Duncans that it was a personal loan to pay off personal debts and not debts of the corporation.
In some respects, Stilley v. Illinois Central R.R. Co., 209 Miss. 414, 47 So.2d 840 (1950), is similar to the case at bar. In Stilley the Court said:
"Mr. Stilley's case is based upon various verbal assurances which he claims he received at several different times in 1943 and 1944 to the effect that the lease would be renewed for such time as would enable him to `amortize' his investment in buildings on the property... .
"Omitting all discussion of the applicability of the Statute of Frauds to the validity or enforceability of the alleged oral contract, the rule is well settled in this state that in suits involving alleged oral agreements assertedly made by agents for the renewal or extension of written leases, the burden of proof is on the person asserting such an agreement not only to establish agency, but he must establish the agent's authority as well. Pan American Petroleum Corp. et al. v. Bardwell, 203 Miss. 833, 33 So.2d 451.
.....

*1356 We are compelled to agree that the chancellor could not have spelled out a contract for the parties from the testimony of Mr. Stilley as to any definite term for which the renewal was to hold. Fully realizing the likely great hardship and financial loss that may be occasioned to Mr. Stilley, the law and evidence in this case compels us to hold that he failed to sustain the burden of proof, both as to the authority of the agent and as to any definite verbal assurances the agent might have given him." 209 Miss. at 418-21, 47 So.2d at 842-43.
For the reasons stated, we are compelled to hold that the trial court erred in not sustaining the motion of the appellant for a peremptory instruction at the close of the case.
The judgment of the lower court is, therefore, reversed and judgment rendered here for the appellant.
REVERSED AND RENDERED.
PATTERSON, C.J., SMITH, P.J., and SUGG, WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.